UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT I. REESE, JR.,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SACRAMENTO; Deputy<br>ZACHARY ROSE (Badge #832),<br><br>Defendants. | No. 2:13-cv-00559-GEB-KJN<br><br>**ORDER GRANTING IN PART/DENYING IN PART DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW; DENYING IN PART DEFENDANTS' MOTION FOR AMENDED JUDGMENT/AMENDING PAST MEDICAL DAMAGES JUDGMENT *SUA SPONTE*; AND DENYING DEFENDANTS' MOTION FOR NEW TRIAL/AMENDING BANE ACT JUDGMENT *SUA SPONTE*** |

Defendants Zachary Rose ("Rose") and County of Sacramento (collectively, "Defendants") move under Federal Rule of Civil Procedure ("Rule") 59 for an order amending judgment, arguing: (1) the jury's damage award for "future non-economic loss" is not supported by evidence, (Defs.' Cty. of Sacramento & Zachary Rose's Mot. for Am. J. or Mot. for New Trial ("New Trial Mot.") 3:14, ECF No. 206); and (2) the jury's past medical damages award should be reduced by the amount of medical expenses the County of Sacramento already paid, (id. at 4:6-7). Defendants also move under Rule 59 for a new trial based on the following assertions: (1) the judge erred when he reduced the number of empaneled jurors from eight to seven, (id. at 4:21); (2) the judge erred when he sustained Plaintiff's objection during a sidebar conference immediately prior to opening statements by

1

ruling Defendants were prevented from mentioning in their opening statement disputed evidence, which they argued in a conclusory manner was admissible under Rule 404(b) of the Federal Rules of Evidence, (id. at 5:5); (3) the judge erred when he included and/or excluded certain language in the jury instructions on Plaintiff Robert I. Reese Jr.'s ("Reese's") Fourth Amendment and Bane Act claims,[1] (id. at 5:27-7:7, 10:3-11); (4) the jury's verdict is contrary to the evidence, (id. at 8:8); (5) the judge erred when he did not grant Defendants' motion *in limine* in which they sought to exclude Reese's police practices expert, (id. at 11:12); and (6) certain of the judge's evidentiary rulings, individually and collectively, prejudiced Defendants, (id. at 11:25).

Defendants also move under Rule 50(b) for judgment in their favor, arguing: all claims are barred by the principle the United States Supreme Court enunciated in Heck v. Humphrey, 512 U.S. 477, 486-87 (1994), which bars a lawsuit if the relief sought would invalidate a criminal conviction, (Defs.' Cty. of Sacramento & Zachary Rose's Renewed Mot. for J. as a Matter of Law ("JMOL Mot.") 2:4-6, ECF No. 205); and Reese failed to satisfy the causation element of each claim, (id. at 12:1). Further, Rose moves under Rule 50(b) for judgment in his favor on Reese's Fourth Amendment excessive force claim, arguing his qualified immunity defense shields him from being exposed to liability on this claim. (Id. at 8:18.)

A general verdict was returned by the jury against Rose

---

[1]   Defendants also vaguely allude to the Court's jury instruction on Reese's battery claim in heading "F." of their motion for new trial but present no argument on this issue; therefore, this issue is ignored.

1  on Reese's Fourth Amendment excessive force claim and against

2  Defendants on Reese's California battery claim and California

3  Bane Act claim. The jury awarded Reese $534,340.00 in damages,

4  which consists of $34,340.00 for past medical expenses,

5  $350,000.00 for past non-economic loss, and $150,000.00 for

6  future non-economic loss. (Revised Verdict Form ("Verdict Form")

7  2, ECF No. 164.) Judgment was entered on January 15, 2016. (ECF

8  No. 197.)

9                          **I.   LEGAL STANDARD**

10         **A.   Renewed Motion for Judgment as a Matter of Law**

11         The following standard applies to a Rule 50(b) motion

12  for judgment as a matter of law:

13              the court . . . may not make credibility
                determinations or weigh the evidence. Rather,
14              [it] must view the evidence in the light most
                favorable to the nonmoving party . . . and
15              draw all reasonable inferences in that
                party's favor. The test applied is whether
16              the evidence permits only one reasonable
                conclusion, and that conclusion is contrary
17              to the jury's verdict.

18  E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir.

19  2009) (first and third alterations in original) (citations and

20  internal quotation marks omitted).

21         **B.   Motion to Amend Judgment**

22         "Amendment or alteration [of the judgment] is

23  appropriate under Rule 59(e) if (1) the district court is

24  presented with newly discovered evidence, (2) the district court

25  committed clear error or made an initial decision that was

26  manifestly unjust, or (3) there is an intervening change in

27  controlling law." Zimmerman v. City of Oakland, 255 F.3d 734, 740

28  (9th Cir. 2001). However, a motion to alter or amend the judgment

                                    3

"may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." Exxon Shipping Co. v. Baker, 554 U.S. 471, 485 n.5 (2008).

**C.   Motion for New Trial**

> The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and [the motion] may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury.

Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251 (1940). "A new trial is only warranted when an erroneous evidentiary ruling 'substantially prejudiced' a party." Ruvalcaba v. City of L.A., 64 F.3d 1323, 1328 (9th Cir. 1995).

**II.   RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

**A.   Heck v. Humphrey**

Defendants argue under Rule 50(b) that judgment should be entered in their favor on all claims, contending that Reese's no contest plea to a violation of California Penal Code section 417(a)(1) renders all claims barred by the following principle enunciated in Heck, 512 U.S. at 486-87 (footnote omitted):

> to recover damages for . . . unlawfulness [that] would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus . . . .

The California Supreme Court applied the reasoning in Heck to

4

1  state claims in <u>Yount v. City of Sacramento</u>, 43 Cal. 4th 885
2  (2008). Defendants argue since each claim contains a liability
3  theory that necessarily implies the invalidity of Reese's
4  California Penal Code section 417(a)(1) conviction, which is
5  proscribed by the <u>Heck</u> principle, all claims are barred by this
6  principle.

7       Reese counters, *inter alia*, that the <u>Heck</u> principle
8  does not apply to this lawsuit because "Defendants never provided
9  the [federal c]ourt with a factual basis for Plaintiff's
10 [referenced] no contest plea" and therefore have not shown that
11 the <u>Heck</u> principle bars any claim. (Pl.'s Mem. in Opp'n to Mot.
12 ("JMOL Opp'n") 3:10-20, ECF No. 208.)

13      It is undisputed that Reese was convicted of violating
14 California Penal Code section 417(a)(l), which states in
15 pertinent part:

16          Every person who, except in self-defense, in
            the presence of any other person, draws or
17          exhibits any deadly weapon whatsoever . . .
            in a rude, angry, or threatening manner, or
18          who in any manner, unlawfully uses a deadly
            weapon . . . in any fight or quarrel is
19          guilty of a misdemeanor . . . .
20 Cal. Penal Code § 417(a)(1).

21      Defendants argue: "Plaintiff admitted [during the jury
22 trial in this case] that he displayed . . . [a] knife when he
23 opened the door [to his apartment in response to knocking on that
24 door], but denied [that this display] was [done in an] angry or
25 threatening [manner], and [he] could not say whether the manner
26 of display was 'not polite.'" (JMOL Mot. 6:8-10 (citing Trial Tr.
27 vol. 2, 357:22-359:19, ECF No. 180).) Reese's testimony
28 concerning the "rude" term in California Penal Code section

1   417(a)(l) is the following:

2           Q. You understand the term "rude"?

3           A. Yes, I do.

4           Q. How is it that you understand it?

5           A. To not be polite.

6           Q. Do you believe that you displayed the
            knife with the officers present in a manner
7           that was not polite? . . .

8           [Plaintiff]: I don't know how to answer that.
            I know I answered the door with a knife in my
9           hand. Rude, not polite, I cannot say.

10  (Trial Tr. vol. 2, 358:17-359:2.)

11          Defendants have not shown that Reese's trial testimony

12  invalidates   his   California   Penal   Code   section   417(a)(l)

13  conviction, since even if Reese's conviction is dependent on a

14  finding of "rudeness," his trial testimony did not invalidate

15  that conviction finding. Nor have Defendants shown that the

16  victim or victims of the conviction were the deputy sheriff

17  officers involved in this federal lawsuit. Therefore, the portion

18  of Defendants' Motion for Judgment premised on the Heck principle

19  is DENIED.

20          B.   **Verdict Is Contrary to the Evidence**

21          Each Defendant contends judgment should be entered in

22  their favor on all claims, or in the alternative a new trial

23  should be ordered, because the evidence presented was neither

24  sufficient to sustain the jury's finding of excessive force nor

25  the causation element of each claim.

26          Defendants argue "no reasonable jury could have found

27  the force [used] was unreasonable" in light of the "fast evolving

28  situation" the deputy sheriff officers encountered. (JMOL Mot. at

13:13–14.) Specifically, Defendants contend force was applied in a situation where sheriff deputies were responding "to a 9-1-1 call for shots fired [by a perpetrator] with an automatic gun[ and] wielding a steak knife in apartment 144." (New Trial Mot. 8:9–11.) Defendants also argue:

> [in s]eeking to further investigate and check on the occupant of apartment 144, and/or make contact in order to gather more information, Deputy Rose stood approximately arms-length away from the door [for apartment 144], and knocked. Deputy Brown positioned himself by some trees about 15 feet south of the front door of apartment 144. Deputies Steindorf, Gillock and Peyton took positions behind Deputy Rose. Other deputies went around the back of the building, or were in the parking lot. As found by the jury, Plaintiff opened the door with a knife in one hand in an elevated position, crossing the threshold. Believing Plaintiff posed an imminent danger to Deputy Rose, Deputy Brown fired one shot from his AR-15 rifle. Deputy Brown thought his round hit Plaintiff. Deputy Rose, who had been at the side of the door, saw Plaintiff move back from the threshold and out of his view. Deputy Rose immediately moved to the area in front of the threshold, and was surprised to see Plaintiff, standing approximately three feet in front of him. Deputy Rose believed Plaintiff still posed a threat, but did not see Plaintiff's hands. Within seconds of Plaintiff opening the door[ and] hearing Deputy Brown fire a shot, Deputy Rose fired one 9mm round from his P-226 Sig Sauer handgun. The jury found that Plaintiff did not brandish the knife, and at the time Deputy Rose fired his shot, it did not appear Plaintiff "posed an immediate threat of death or serious physical injury." The jury found Rose's round struck Plaintiff, and not Brown's. Defendant Rose submits this fast evolving situation means no reasonable jury could have found the force was unreasonable.

(Id. at 8:11–27.)

        Reese counters the "jury's determination that Plaintiff did not pose an immediate threat of death or serious physical

injury to Rose when Plaintiff was shot was . . . consistent with the trial evidence." (Opp'n to New Trial Mot. ("New Trial Opp'n") 15:5-7, ECF No. 210.) Reese argues:

> Upon [Rose] seeing Plaintiff open the door with a knife in his hand, Deputy Rose's immediate reaction was to back up. As Deputy Rose backed up, Plaintiff never advanced toward him. Deputy Rose never saw Plaintiff step out of his apartment. Plaintiff did not make any threats towards Deputy Rose. After he backed up some distance, Deputy Rose heard the first gunshot fired by Deputy Brown. Deputy Brown fired approximately one to two seconds before Deputy Rose fired and only fired once because he saw the knife drop, saw Plaintiff backing up inside his apartment, and understood that the threat was reduced or gone after his first shot.

(Id. at 15:6-16.)

Defendants also contend: "Plaintiff did not establish [the] causation [element of any claim by] . . . a preponderance of the evidence in terms of a touching or [a] constitutional violation, . . . [and this causation element] hinges on Rose's round being the round that hit Plaintiff, a[nd] it is undisputed only one round did so." (New Trial Mot. 8:28-9:2.) Specifically, Defendants argue Reese's counsel asked the jury during closing argument to speculate as to causation by "arguing[,] 'how could Rose miss at three feet away?'" (Id. at 9:26-27.) Defendants further contend Reese did not present forensic evidence, trajectory expert testimony, or an explanation of "the [following] physical impossibility": Rose is taller than Reese, Reese stood inside his apartment on an elevated surface located at the entry point of the door threshold, "Rose was not situated above Plaintiff[,] and there was no evidence Plaintiff was bending over." (JMOL Mot. 13:17-27.)

1    Reese rejoins: there "was strong circumstantial

2    evidence that undermined the officers' narrative and showed that

3    Brown could not have fired the shot that struck Plaintiff." (New

4    Trial Opp'n 14:13-15.) Reese further argues:

5        Brown is 5'9" and held the rifle at shoulder
     level or still below shoulder level as he had
6        not fully brought the gun up to a level
     position when he fired whereas Plaintiff is
7        5'7" (and sustained a bullet injury with an
     entry wound near his sternum/front of chest
8        described by Dr. Owens and Dr. Humphries as
     having a downward path with an angle between
9        10 and 45 degrees. There were two rounds
     recovered in the apartment and the bullet in
10       the kitchen wall behind Plaintiff was
     approximately 5 to 6.5 feet off the ground.

11

12       Brown admitted uncertainty as to whether or
     not his round struck Reese and acknowledged
13       that his trial testimony was different for
     [sic] his deposition testimony so as to
14       suggest (at trial) that i[t] was more likely
     that he had shot Plaintiff. Rose, in
15       contrast, acknowledged seeing Plaintiff
     standing there, with no blood . . . and no
16       indication of having been shot when Rose
     fired his round aimed at Plaintiff's chest
17       approximately a 60 degree angle. After Rose
     fired, Plaintiff fell backwards, leaving Rose
18       with the impression that his round had struck
     Plaintiff. Rose also saw blood on Reese after
     Rose fired.
19

20   (Id. at 14:15-15:4 (citations omitted).)

21       Reese also argues:

22       The bullet fired from Brown's rifle lodged in
     the wall of the kitchen six and a half feet
23       off the ground. Given that the rifle bullet
     lodged in the wall at a height that was above
24       Reese's head, it is inconceivable that a
     bullet leaving his body at a downward angle
25       could have lodge there. The bullet from
     Deputy Rose's pistol, in contrast, lodged in
26       a closet door three and a half feet off the
     ground. There was evidence (carpet fibers on
27       the bullet) suggesting that the pistol
     bullet, after leaving Reese, had ricocheted
28       off the floor before becoming lodged in the

9

closet door. In contrast, there were no
carpet fibers on the rifle bullet and thus no
indication that the rifle bullet had
ricocheted.

(JMOL Opp'n 14:24-15:4 (citations omitted).)

Defendants have not sustained their burden of showing that the evidence is insufficient to support the jury's liability findings. Therefore, these motions are DENIED.

### C.  Qualified Immunity

Rose moves for judgment on his qualified immunity defense, arguing this defense shields him from liability on Reese's federal Fourth Amendment claim. Specifically, Rose relies on the clearly established law prong of this defense, contending there was no clearly established law evincing that Rose lacked probable cause to believe that Reese posed an immediate threat of death or serious physical injury to Rose when Rose applied the subject force. (JMOL Mot. 11:17-25.)

Reese counters: "it is clearly established that the use of deadly force is not reasonable if the [the victim of the force] does not pose an immediate threat of death or serious bodily injury"; and here "[w]hether an immediate threat actually existed is a question of fact that was determined by the jury" when it answered "no" to the following written question: "At the time Deputy Rose fired his shot, did it **appear** that Plaintiff posed an immediate threat of death or serious physical injury to Deputy Rose?" (JMOL Opp'n 12:24-27; Verdict Form Question No. 14 (emphasis added).)

Decision on the clearly established law prong of Rose's qualified immunity defense requires determining the factual

circumstances attendant to Rose's use of deadly force, so that it can be ascertained whether "any reasonable" law enforcement officer would have understood that use of deadly force was then proscribed by clearly established Fourth Amendment excessive force law in the circumstances that could have been perceived to exist when Rose applied the subject force. The United States Supreme Court explains in <u>City & County of San Francisco v. Sheehan</u>, 135 S. Ct. 1765, 1774 (2015) (emphasis added): "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that **any reasonable official in [his] shoes would have understood that he was violating it,'** meaning that 'existing precedent . . . placed the statutory or constitutional question beyond debate.'" Close scrutiny of Question Number 14, submitted to the jury, reveals that the jury's answer to that question does not aid in the analysis of what any objectively reasonable officer in Rose's shoes would have perceived and done in Rose's situation, because Question Number 14 does not specify from whose perspective it did appear that Reese posed an immediate threat of death or serious physical injury to Rose, and the word "appear" in Question Number 14 is vague. The United States Supreme Court explains in <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986), that law enforcement officers "will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that . . . [the subject force at issue was within constitutional bounds]; but if officers of reasonable competence could disagree on this issue, immunity should be recognized."

Examination of Question Number 14 reveals it sought a

11

1   response from the jury that was "purely speculative." Vojdani v.

2   Pharmsan Labs, Inc., 741 F.3d 777, 782 (7th Cir. 2013) (finding

3   district court had discretion to reject plaintiff's

4   interpretation of a special jury instruction, even though

5   plaintiff's interpretation would have been consistent with the

6   verdict, because to accept plaintiff's interpretation would allow

7   the jury to render a "purely speculative" finding). "'The jury's

8   role as the finder of fact does not entitle it to return [an

9   answer to a question] based only on confusion [or] speculation.'"

10  Hernandez v. Keane, 341 F.3d 137, 143 (2d Cir. 2003) (quoting

11  Goldhirsh Grp., Inc. v. Alpert, 107 F.3d 105, 108 (2d Cir.

12  1997)).

13          The speculative nature of this finding is evinced by

14  the common definition of the word "appear" in Question Number 14,

15  which is "seem" or "give the impression of being." Appear:

16  Definition of Appear, Oxford Dictionary (May 16, 2016, 10:35 AM),

17  http://www.oxforddictionaries.com/us/definition/american_english/

18  appear. "[T]he court may look to sources such as dictionaries for

19  a definition [of a term]." United States v. Mohrbacher, 182 F.3d

20  1041, 1048 (9th Cir. 1999) (citing Muscarello v. United States,

21  524 U.S. 125, 128-130 (1998)); see also United States v. Maciel-

22  Alcala, 612 F.3d 1092, 1096 (9th Cir. 2010) (stating: "dictionary

23  definitions are cognizable" as tools for determining the ordinary

24  meaning of words used in a statute); Terrell v. United States,

25  564 F.3d 442, 451 (6th Cir. 2009) (citing MCI Telecomm. Corp. v.

26  Am. Tel. & Tel. Co., 512 U.S. 218, 225 (1994); Nat'l R.R.

27  Passenger Corp. v. Bos. & Me. Corp., 503 U.S. 407, 418 (1992))

28  ("A word's ordinary meaning is often determined by reference to

dictionaries."). Applying this definition of the word "appear" reveals that Question Number 14 asks: "did it [seem or give the impression of being] that Plaintiff posed an immediate threat of death or serious physical injury." This language is too vague for Question Number 14 to constitute a "fact" because it connotes "supposition" or a guess about what "might have happened." See United States v. Jones, 856 F.2d 146, 150 (11th Cir. 1988) (citing 35 C.J.S., Fact § 490 (1960); Black's Law Dictionary 531 (rev. 5th ed. 1969) (defining a fact as that which has taken place)) (defining a "fact" as "a reality as distinguished from supposition or opinion; . . . a truth as distinguished from fiction or error; what took place, as distinguished from what might or might not have happened"). The phrasing also does not address whether law enforcement officers of reasonable competence in Rose's position may have had the reasonable but mistaken belief that his life was in immediate danger when deadly force was used. See C.B. v. City of Sonora, 769 F.3d 1005, 1027 (9th Cir. 2014) ("An officer who reasonably but mistakenly believes that his actions are warranted . . . may be entitled to qualified immunity."). The jury's ambiguous response to Question Number 14 is not the jury's fault because it was Rose's obligation to prepare a non-ambiguous question on his qualified immunity defense. See Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007) ("To the extent that a particular finding of fact is essential to a determination by the court that the defendant is entitled to qualified immunity, it is the responsibility of the defendant to request that the jury be asked the pertinent question.") Reese insisted that the judge not be involved in

13

1  formulating qualified immunity jury questions, and argued that it
2  was solely the obligation of the proponent of the qualified
3  immunity affirmative defense to satisfy his burden of presenting
4  the jury with clear questions pertinent to that defense.

5       The jury should not have been required to return an
6  answer to Question Number 14 since the question sought a
7  speculative response. Nevertheless, "[j]udgment as a matter of
8  law is appropriate [on the qualified immunity issue] when the
9  evidence presented at trial permits only one reasonable
10  conclusion." Santos v. Gates, 287 F.3d 846, 851 (9th Cir. 2002);
11  Thompson v. Mahre, 110 F.3d 716, 721 (9th Cir. 1997) ("Findings
12  of fact are ordinarily reviewed for clear error, but application
13  of law to the facts to determine whether on those facts,
14  qualified immunity is established, is reviewed de novo, because
15  the determination of qualified immunity on facts not genuinely at
16  issue is for the court."). However, when deciding this issue "the
17  jury's view of the facts must govern [the court's]
18  analysis . . . ." A.D. v. Cal. Highway Patrol, 712 F.3d 446, 457
19  (9th Cir. 2013).

20       The facts evince that Rose confronted Reese on
21  March 25, 2011, sometime after Rose responded to a 9-1-1 call at
22  5:00 AM concerning shots fired in Reese's apartment complex. The
23  9-1-1 caller gave Reese's apartment number as the location of the
24  person who fired a pistol described as an automatic firearm and
25  said Reese also had a knife, was acting crazy, and was possibly
26  high on drugs. (Trial Tr. vol. 1, 97:12-21, ECF No. 179; Trial
27  Tr. vol. 2, 230:17-21, 232:10-13.) Rose knocked on Reese's door.
28  (Trial. Tr. vol. 1, 103:11-12.) Rose was the closest officer to

the door. (Id. at 108:12-15.) The jury found that Reese responded to the knock by opening the door with a knife in his hand held in an "elevated position," and a "part" of Reese's "body cross[ed] the threshold of the door prior to when Sherriff Deputy Brown" fired the "first shot" at Reese. (Verdict Form Question Nos. 6, 7.) After Brown fired his weapon at Reese, Reese immediately moved back into the apartment, out of Rose's sight. (Trial Tr. vol. 1, 186:13-15.) Rose then pursued Reese by entering the apartment, and upon entry he saw Reese facing him from only three to five feet away—within arm's reach. (Trial Tr. vol. 2, 206:17-18, 238:04-06.) At that moment—immediately before Rose fired his weapon at Reese—the jury found that Rose did not see Reese's hands. (Verdict Form Question No. 13.) The evidence evinces that the entire episode, from the moment Reese opened the door to when Rose shot Reese, occurred "very quickly." (Trial Tr. vol. 2, 209:12-13.) Rose testified that "approximately two seconds" passed between Brown's shot and Rose's shot, (id. at 213:10-12); Brown testified that one and a half seconds to two seconds passed between his shot and Rose's shot, (Trial Tr. vol. 1, 116:06-08); and Reese testified that he felt pain "a second or two" after he heard the first shot, (Trial Tr. vol. 2, 142:21-23).

Further, the undisputed evidence evinces that after the first shot Rose pursued Reese to apprehend him, Reese was arrested, and Reese was subsequently taken to the hospital for treatment of his injury. (Trial Tr. vol. 3, 571:7-8, ECF No. 181.) The probable cause justifying Reese's arrest is undisputed. "[W]hen [a] police [officer] . . . [has] probable cause to . . . arrest [a criminal suspect for a crime reasonably perceived to

1  have occurred in the officer's presence, the suspect's] act of
2  retreating into [his apartment does not] thwart an otherwise
3  proper arrest." <u>United States v. Santana</u>, 427 U.S. 38, 42 (1976).
4  Further, "[w]henever an officer restrains the freedom of a person
5  to walk away, he has seized that person," and "there can be no
6  question that apprehension by the use of deadly force is a
7  seizure subject to the reasonableness requirement of the Fourth
8  Amendment." <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985). However,
9  "[w]here the suspect poses no immediate threat to the officer and
10 no threat to others, the harm resulting from failing to apprehend
11 him does not justify the use of deadly force to do so." <u>Id.</u> at
12 11.

13         The issue is whether the extant of clearly established
14 law in March 2011 would have put a reasonable officer in Rose's
15 position on notice that his use of deadly force would effect a
16 Fourth Amendment violation. The Supreme Court discussed the
17 factual similarity required by clearly established law doctrine
18 in <u>Ashcroft v. al-Kidd</u>, 131 S. Ct. 2074, 2083 (2011), explaining
19 that the principle "do[es] not require a case directly on point,
20 but existing precedent must have placed the statutory or
21 constitutional question beyond debate."

22         Qualified immunity shields an officer from
           suit when [he] makes a decision that, even if
23         constitutionally deficient, reasonably
           misapprehends the law governing the
24         circumstances []he confronted. Because the
           focus is on whether the officer had fair
25         notice that [his] conduct was unlawful,
           reasonableness is judged against the backdrop
26         of the law at the time of the conduct. If the
           law at that time did not clearly establish
27         that the officer's conduct would violate the
           Constitution, the officer should not be
28         subject to liability . . . .

1   Brosseau v. Haugen, 543 U.S. 194 (2004); see also Mattos v.

2   Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (explaining that when

3   deciding whether "actions constituted [an illegal measure] of

4   'deadly force,' all that matters is whether [the defendant's]

5   actions were reasonable" (alterations in original)).

6   "Reasonableness[] is always a very fact-specific inquiry." C.B.,

7   769 F.3d at 1026.

8          Reese "bears the burden to show that the contours of

9   the right [not to be subjected to deadly force] were clearly

10  established" under the circumstances involved in this case.

11  Clairmont v. Sound Mental Health, 632 F.3d 1091, 1109 (9th Cir.

12  2011); Sorrels v. McKee, 290 F.3d 965, 969 (9th Cir. 2002)

13  (stating "plaintiff bears the burden of showing that the right at

14  issue was clearly established under this [clearly established

15  right] prong" of the qualified immunity analysis). "Without that

16  'fair notice,' an officer is entitled to qualified immunity."

17  Sheehan, 135 S. Ct. at 1777. However, Reese has not cited

18  authority containing facts closely analogous to this case that is

19  sufficient to have placed Rose on notice that he could not use

20  deadly force under the circumstances involved in this lawsuit.

21         Further, even if Rose was mistaken in believing that

22  Reese still held a knife when Rose shot him, the qualified

23  immunity law gives officials "breathing room to make reasonable

24  but mistaken judgments." Sheehan, 135 S. Ct. at 1774. (See, e.g.,

25  Trial Tr. vol. 2, 336:2–3 (Reese testifying: "I believe I dropped

26  the knife sometime after the door and the bang.").) "[T]he

27  pivotal issue is whether [Rose], or an officer in [Rose's]

28  position, would reasonably fear that [Reese] was going to [stab]

                                    17

him." Bowles v. City of Porterville, 571 F. App'x 538, 540 (9th Cir. 2014). This principle is illustrated in Bowles, where an officer shot and killed a suspect who pivoted and pointed a metallic object at the officer, which the officer believed to be a gun. Id. The metallic object was ultimately discovered to be the cylindrical top of a cologne bottle. Id. However, despite the officer's mistake, the Ninth Circuit found the officer's fear was reasonable because it was dark, the suspect had a cologne bottle with a metallic cylindrical top, the officer showed prior restraint, and it was a "'tense, uncertain, and rapidly evolving'" situation. Id. (quoting Graham, 490 U.S. at 397).

Similarly, an officer in Rose's situation could have had the "reasonable but mistaken belief" regarding his entitlement to use deadly force on Reese. Thomas v. Dillard, __F.3d__, 2016 WL 1319765, at *19 (9th Cir. 2016). Therefore, Rose's motion for judgment on his affirmative qualified immunity defense from being liable for Reese's Fourth Amendment excessive force claim is GRANTED. See Snyder v. Trepagnier, 142 F.3d 791, 800 (5th Cir. 1998) ("There is no inherent conflict between a finding of excessive force and a finding of qualified immunity.").

### III.  MOTION TO AMEND JUDGMENT/MOTION FOR NEW TRIAL

#### A.  Reduction of Damages

##### 1.  Pain and Suffering

Defendants argue judgment should be amended because the jury's award of $150,000 for "future non-economic loss" is not supported by evidence. (New Trial Mot. 3:14.) Specifically, Defendants contend: "[Reese] did not testify he continued to

18

1   suffer any physical pain, 'fright, nervousness, grief, anxiety,

2   worry, mortification, shock, humiliation, indignity,

3   embarrassment, apprehension, terror or ordeal.'" (Id. at 3:24-27

4   (quoting Capelouto v. Kaiser Found. Hosps., 7 Cal. 3d 889, 892-93

5   (1972)).) Reese counters that evidence of his permanent scars

6   "throughout his upper body" was sufficient for the jury to infer

7   "that the permanent scars will affect [him in the] future." (Id.

8   at 7:11-12.)

9        "A jury's verdict, including a damages award, must be

10  upheld if supported by 'substantial evidence.'" Freitag v. Ayers,

11  468 F.3d 528, 537 (9th Cir. 2006). Damages may be reduced if they

12  are "clearly unsupported by evidence"; and "an otherwise

13  supportable verdict must be [upheld] unless it is grossly

14  excessive or monstrous or shocking to the conscience." Brady v.

15  Gebbie, 859 F.2d 1543, 1557 (9th Cir. 1988) (internal quotation

16  marks and citation omitted).

17       The jury viewed Reese's scars during the trial (Trial

18  Tr. vol. 2, 337:12-24), and heard Reese's following testimony

19  concerning his scars:

20            Q. Do you have any scars on your body from
              the surgeries?
21
              A. Yes, I do.
22
              Q. And where are the scars on your body?
23
              A. Right side, one scar comes from here all
24            the way back around by my shoulder blade.

25  (Id. at 336:24-337:3.)

26       Awards for non-economic damages, which include pain and

27  suffering, can be supported by a finding of permanent scarring.

28  See, e.g., Hall v. N. Am. Indus. Servs., Inc., No. 1:06-cv-0123

OWW SMS, 2008 WL 789895, at *7 (E.D. Cal. Mar. 21, 2008) (non-economic damages include both pain and disfigurement); <u>Kennedy v. United States</u>, No. CV08-02988 GAF(OPx), 2009 WL 3348404, at *12 (C.D. Cal. Oct. 13, 2009) (stating that plaintiff was entitled to non-economic damages for "pain, suffering, **scarring**, . . . and other consequences of her injuries" (emphasis added)).

> In general, courts have not attempted to draw distinctions between the elements of "pain" on the one hand, and "suffering" on the other; rather, the unitary concept of "pain and suffering" has served as a convenient label under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal.

<u>Capelouto</u>, 7 Cal. 3d at 892-93.

In light of Reese's scarring, an inference can reasonably be drawn that Reese will continue to endure suffering. Therefore, Defendants have not shown that this portion of the judgment should be amended.

**2.   Past Medical Expenses**

Defendants argue Reese's damages award for past medical expenses "should be reduced or offset" by $21,175.00, which is the amount the County of Sacramento has "already paid" under the County Indigent Program. (New Trial Mot. 4:8-9, 17-18.) Defendants argue California Government Code section 985(b) authorizes this post-jury verdict reduction. (<u>Id.</u> at 4:12-13.) Reese counters that Defendants' reliance on this California procedural law is misplaced "because this case is before the Court on federal question jurisdiction." (New Trial Opp'n 8:10-11.)

1    This procedural issue need not be decided since during

2    trial the parties informed the jury that they stipulated as

3    follows:

> [F]or the past hospital bills of Robert Reese
> related to this incident $21,175 has been
> paid. No further amounts are owed by Robert
> Reese except for an additional $165. The
> parties agree that these amounts do not
> include the amounts owed to the doctors who
> treated Mr. Reese.

8    (Trial Tr. vol. 4, 642:1-7, ECF No. 182.)

9    "Under federal law, stipulations . . . are generally

10   binding on the parties and the Court." Am. Title Ins. Co. v.

11   Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988). Reese does not

12   dispute that the County Indigent Program paid these expenses.

13   Therefore, in light of this stipulation, and to prevent

14   injustice, the judgment shall be amended by reducing $21,175.00,

15   which is the amount the County Indigent Program paid for Reese's

16   medical expenses. See E.E.O.C. v. Waffle House, Inc., 534 U.S.

17   279, 297 (2002) ("[I]t goes without saying that the courts can

18   and should preclude double recovery by an individual." (internal

19   quotation marks omitted)); F.C. Wheat Mar. Corp. v. United

20   States, 663 F.3d 714, 725 (4th Cir. 2011) (upholding the district

21   court's amended judgment of the jury's damages award to prevent

22   double recovery); cf. Brady, 859 F.2d at 1557-58 ("[A] jury's

23   award . . . should not be overturned or decreased unless it is

24   clearly unsupported by the evidence or 'shocks the

25   conscience.'"). Accordingly, Reese is awarded $13,165.00 in past

26   medical expenses.

27   **B.   Reducing the Jury to Seven (7) Jurors**

28   Defendants argue they are entitled to a new trial

21

1   because the trial judge wrongfully reduced the number of jurors
2   prescribed in the supplemental pretrial order from eight (8) to
3   seven (7) jurors, which Defendants contend constitutes
4   prejudicial error. (New Trial Mot. 4:21.)

5           Initially, the trial judge issued a pretrial order
6   stating eight (8) jurors would be empaneled. (Supplemental
7   Pretrial Conference Order 3:16, ECF No. 81.) However, after
8   Reese's counsel indicated at a bench conference during voir dire
9   and off the record that Reese preferred less than eight (8)
10  jurors be impaneled, (Trial Tr. vol. 1, 39:23-40:2), the trial
11  judge reduced the number of jurors to be impaneled from eight (8)
12  to seven (7), (id. at 40:16-18). Defendants objected to this
13  reduction, but ultimately stated: "in terms of the number moving
14  from eight to seven, we certainly understand that the court *sua*
15  *sponte* has the discretion . . . ." (Id. at 44:1-5.) The trial
16  judge stated he exercised that discretion, and this decision was
17  made before the parties were provided the opportunity to exercise
18  preemptory challenges. (Compare Trial Tr. vol. 1, 39:23-40:18,
19  with Trial Tr. vol. 1, 68:14.) Defendants have not shown this
20  reduction is a basis for a new trial. See Fed. R. Civ. P. 48(a)
21  (affording the trial judge the discretion to empanel between six
22  and twelve jurors); Montiel v. City of L.A., 2 F.3d 335, 338 (9th
23  Cir. 1993) ("[Rule 48] clearly states that a district court may
24  empanel between six and twelve jurors. . . . Accordingly, the
25  district court committed no error in seating a twelve-person
26  jury.").

27      **C.   Reference to Rule 404(b) Evidence in Opening Statement**
28          Defendants argue they are entitled to a new trial

because the trial judge erred in refusing to allow Defendants to reference evidence in their opening statement, concerning text messages about a dispute Reese allegedly had with his apartment complex neighbors before the deputy sheriff officers arrived at the apartment complex, to which Reese objected. (New Trial Mot. 5:5-6.) However, the trial transcript evinces that Defendants referenced this disputed evidence in their opening statement by stating: "Now, in [P]laintiff's opening argument, counsel said that [Plaintiff] believed [P]laintiff didn't know who was at the door[; w]e believe there is evidence to the contrary." (Trial Tr. vol. 1, 95:15-18.) Although the trial transcript reveals Defendants desired to include more factual information in their opening statement, Reese objected, arguing at sidebar that information concerning "a dispute between the plaintiff and a neighbor before the police ever got there" involves extrinsic details unknown to the deputies before they contacted Reese. (Trial Tr. vol. 1, 82:23-83:1.) Defendants responded:

> [Defense Counsel]: . . . Our position would be this was a subject of [P]laintiff's motion in limine that the [C]ourt denied, and because the evidence may be what it is, I think we're entitled to at least argue what the evidence may show.
>
> We believe that information related to what happened prior to the officer showing up goes to [P]laintiff's state of mind, his motive, opportunity, essentially the way he opened the door. Because of that, we believe it is all relevant, at the very least, to the damages.
>
> I think this is an effort to essentially re-argue the motion in limine that was denied.

(Id. at 83:13-24.)

1    This dispute concerned the admissibility of Rule 404(b)

2  evidence; however, Defendants' argument did not articulate

3  clearly how the disputed Rule 404(b) evidence tended to establish

4  Reese's "state of mind," what was meant by the "motive" and

5  "opportunity" propositions, and how these propositions were

6  probable on what Defendants argued was "essentially the way

7  [Reese] opened the door." These conclusory assertions failed to

8  satisfy Defendants' burden under Rule 404(b) of clearly

9  articulating a purpose for which the evidence was admissible.[2]

10 _____

11  [2]    Defendants had been previously alerted concerning their burden as the
proponent of Rule 404(b) evidence in a motion *in limine* ruling filed
October 26, 2015, as follows:

12                     []Upon objection . . . , *the proponent of
                  the evidence . . . should be required to
13                  identify the specific purpose or purposes for
                  which [the party] offers the evidence* of 'other
14                  crimes, wrongs, or acts.' By so requiring, we do
                  not mandate hypertechnicality. . . .
15                  Nevertheless, the [proponent's] purpose in
                  introducing the evidence must be to prove a fact
16                  that . . . [is] in issue . . . .
                       After requiring the proponent to identify
17                  the specific purpose for which the evidence is
                  offered, the district court must determine
18                  whether the identified purpose . . . is
                  "material"; that is, whether it is "in issue" in
19                  the case. If the court finds it is, the court
                  must then determine, before admitting the other
20                  acts evidence, whether the probative value of
                  the evidence is substantially outweighed by the
21                  danger of unfair prejudice under [FRE] 403. If
                  the evidence satisfies [FRE] 403, then, after
22                  receiving the evidence, the district court must
                  "clearly, simply, and correctly" instruct the
                  jury as to the specific purpose for which they
23                  may consider the evidence.[]
                  United States v. Curtin, 489 F.3d 935, 957 (9th Cir.
24                  2007) (emphasis added) (quoting United States v.
                  Merriweather, 78 F.3d 1070, 1076-77 (6th Cir. 1996)).
25                  "Indeed, when a proponent of [FRE] 404(b) evidence
                  contends that it is both relevant and admissible for a
                  proper purpose, '*the proponent must clearly articulate
26                  how that evidence fits into a chain of logical
                  inferences, no link of which may be the inference that
27                  the defendant has the propensity to [act in a certain
                  manner].'" Becker v. ARCO Chemical Co., 207 F.3d 176,
28                  191 (3rd Cir. 2000) (quoting United States v. Morely,

1    Further, during trial Defendants elicited testimony,

2    when cross-examining Reese, about the argument Reese had with his

3    neighbors and the text messages Reese and his neighbors exchanged

4    before the deputy officers' arrival. (See Trial Tr. vol. 2,

5    342:20-355:12 ("Q. Did you and Nathan, after Brittany left

6    without the bottle, exchange heated words? A. We exchanged text

7    messages.").)

8    This portion of Defendants' motion reveals that

9    Defendants misapprehended the purpose of an opening statement,

10   and their burden of identifying the specific purpose for which

11   Rule 404(b) evidence is offered so that it could be determined

12   whether the identified purpose is material to an issue in the

13   case, and also whether it should be admitted in light of Rule 403

14   considerations. "The opening statement is not evidence in itself,

15   but serves 'to give the jury the broad outlines of the case to

16   enable the jury to comprehend it.'" United States v. De Peri, 778

17   F.2d 963, 978 (3rd Cir. 1985) (quoting Gov't of Virgin Is. v.

18   Turner, 409 F.2d 102, 103 (3d Cir. 1968)). Defendants have not

---

19   199 F.3d 129, 133 (3rd Cir. 1999)).

20           Here, Defendants have failed to satisfy their
     burden to admit the text messages under FRE 404(b).
     They have neither clearly identified a specific

21   purpose permitted under FRE 404(b), nor shown that
     such purpose is material to this case. Cf. United

22   States v. Gomez, 763 F.3d 845, 856, 860 (7th Cir.
     2014) (stating FRE 404(b) "allows the use of other-act

23   evidence only when its admission is supported by some
     propensity-free chain of reasoning"; "caution[ing]

24   against judicial freelancing in . . . [the FRE 404(b)
     limiting instruction] area"; and stating "the limiting

25   instruction should be customized to the case rather
     than boilerplate.").

26   (Order on Pl.'s Mots. in Limine 5:21-7:1, ECF No. 145.) See generally Palmerin
     v. City of Riverside, 794 F.2d 1409, 1413 (9th Cir. 1986) ("Pretrial motions

27   are useful tools to resolve issues which would otherwise 'clutter up' the
     trial[; and s]uch motions reduce the need for sidebar conferences and argument
     outside the hearing of the jury, thereby saving jurors' time and eliminating

28   distractions.")

1  shown that they were prejudiced by the trial judge's refusal to

2  permit Defendants to detail the disputed Rule 404(b) evidence in

3  their opening statement. Therefore, the motion for a new trial on

4  this ground is denied.

5      **D.    Failure to Give Requested Bane Act Instruction**

6          Defendants argue they are entitled to a new trial on

7  Reese's state claim alleged under the Bane Act, contending that

8  the Court erred in failing to give their proposed California

9  Civil Jury Instruction (CACI) 3066, and the instruction given

10 equates a factual and legal finding of Fourth amendment excessive

11 force liability with liability under Reese's Bane Act claim. (New

12 Trial Mot. 10:4-5.)

13         Consideration of the facts involved with Reese's Bane

14 Act claim reveals Defendants are correct in their argument that

15 in this case their proposed instruction should have been given.

16 Regarding the facts involved in the instant lawsuit California

17 Appellate Court authority reveals[3]: The Bane Act "requires a

18 showing of coercion independent from the coercion inherent in the

19 [constitutional violation] itself." <u>Shoyoye v. Cty. of L.A.</u>, 203

20 Cal. App. 4th 947, 959 (2012). The trial evidence in this case

21 does not support this Bane Act element. Although no California

22

_____

23 [3]    "[W]hen (1) a federal court is required to apply state law, and (2)
   there is no relevant precedent from the state's highest court, but (3) there
24 is relevant precedent from the state's intermediate appellate court, the
   federal court must follow the state intermediate appellate court decision
25 unless the federal court finds convincing evidence that the state's supreme
   court likely would not follow it." <u>Ryman v. Sears, Roebuck & Co.</u>, 505 F.3d
26 993, 994 (9th Cir. 2007); <u>see also</u> <u>Hayes v. Cty. of San Diego</u>, 658 F.3d 867,
   871-72 (9th Cir. 2011) (citations omitted) ("[T]he task of the federal courts
27 is to predict how the state high court would resolve it. In undertaking this
   analysis, a federal court . . . is not free to reject a state judicial rule of
28 law merely because it has not received the sanction of the state's highest
   court." (internal quotation marks omitted)).

Appellate Court decision addresses whether excessive force **alone**—
"the use of excessive force during an otherwise lawful arrest,"
Bender v. County of Los Angeles, 217 Cal. App. 4th 968, 978
(2013)—is sufficient to sustain a Bane Act violation, several
decisions indicate more is required. See Shoyoye, 203 Cal. App.
4th at 955-56 ("The essence of a Bane Act claim is that the
defendant, by the specified improper means (i.e., 'threats,
intimidation or coercion'), tried to or did prevent the plaintiff
from doing something he . . . had the right to do under the law
or to force the plaintiff to do something that he . . . was not
required to do under the law." (quoting Jones v. Kmart Corp., 17
Cal. App. 4th 329, 339 (1998))); Venegas v. Cty. of L.A., 32 Cal.
App. 4th 820, 842-43 (2004) (stating that although the benefits
of the Bane Act are not restricted to actual or perceived members
of a protected class, "its provisions are limited to threats,
intimidation, or coercion that interfere[] with a constitutional
or statutory right").

Therefore, the jury instruction as given did not
comport with the plain language in the Bane Act which requires
that in this case Reese demonstrate "threat, intimidation, or
coercion" beyond the shooting itself. See Cal. Civ. Code § 52.1;
see also Lanier v. City of Fresno, No. CV F 10-1120 LJO SKO, 2011
WL 149802, at *5 (E.D. Cal. 2011) ("[A]llegations of excessive
force do not equate to section 52.1 threats, intimidation or
coercion."); Justin v. City and Cty. of S.F., No. C05-4812 MEJ,
2008 WL 1990819, at *9 (N.D. Cal. 2008) ("Section 52.1 is only
applicable when a defendant intends by his or her conduct to
interfere with a separate affirmative right enjoyed by a

1    plaintiff; it does not apply to plaintiff's allegation of use of
2    excessive force absent a showing that the act was done to
3    interfere with a separate state or federal constitutional
4    right.").

5         Since liability under the Bane Act has been fully
6    briefed and the evidentiary record concerning this claim is
7    complete, instead of granting a new trial an amended judgment
8    will issue in favor of Defendants on this claim. See generally,
9    Portsmouth Square, Inc. v. S'holders Prot. Comm., 770 F.2d 866,
10   869-70 (9th Cir. 1985) ("Under certain limited circumstances a
11   district court may issue summary judgment [*sua sponte*] . . .
12   [such as when] it appears from all the evidence presented that
13   there is no genuine issue of material fact and [a] party is
14   entitled to judgment as a matter of law."); Nozzi v. Hous. Auth.
15   of City of L.A., 806 F.3d 1178, 1199-200 (9th Cir. 2015)
16   (consistent with Fed. R. Civ. P. 56, granting summary judgment
17   *sua sponte* is appropriate to "preserve[] judicial resources by
18   preventing courts from having to preside over unnecessary trials
19   where no genuine issues of fact are in dispute" (internal
20   quotation marks and citations omitted)).

21        **E.    Court's Denial of Defendants' Motion *in Limine* Number**
22             **6: Testimony of Clark**

23        Further, Defendants contend the Court's denial of their
24   Motion *in Limine* (MIL) Number 6 entitles them to a new trial
25   because the ruling constitutes prejudicial error. (New Trial Mot.
26   11:12-24.) Reese counters "Defendants do not actually cite any
27   evidence in making their argument about [MIL Number 6; m]oreover,
28   after the [C]ourt conditionally denied the motion *in limine* for

1   insufficient factual content, Defendants never sought to re-raise

2   the issue at a subsequent time." (New Trial Opp'n 17:6-9.) Reese

3   contends: "On [this] basis alone, the argument should be

4   rejected." (Id. at 17:9-10.)

5           Defendants moved in MIL Number 6 to exclude Reese's

6   police practices "expert" Roger Clark from offering specific

7   opinions at trial. (Defs.' Mot. *in Limine* No. 6 2:2-6, ECF No.

8   88.) Defendants contend, *inter alia*, that based upon his Rule 26

9   report Clark's testimony would constitute an impermissible

10  opinion as to his legal conclusion, i.e., an opinion on an

11  ultimate issue of law. (Id. at 4:1-5.)

12          The challenged order denying MIL Number 6 states in

13  pertinent part: "[s]ince it is unclear what questions Mr. Clark

14  will be asked and whether any response could be challenged, a

15  sufficient factual context is lacking to decide before trial the

16  remaining portions of this motion." (Order Addressing Defs.' MIL

17  11:7-10, ECF No. 144.) Since it is evident that the challenged *in*

18  *limine* ruling does not constitute a definitive ruling, Defendants

19  have not shown they have authority justifying their motion.

20  "Absent a thorough examination of the objection raised in the

21  motion *in limine* and an explicit and definitive ruling by the

22  district court that the evidence is [or is not] admissible, a

23  party" cannot challenge the *in limine* ruling and is required to

24  make a "contemporaneous objection" during the trial concerning

25  proffered evidence it deems inadmissible. United States v.

26  Archdale, 229 F.3d 861, 864 (9th Cir. 2000); cf. United States v.

27  Lui, 941 F.2d 844, 846 (9th Cir. 1991) (citing Palmerin, 794 F.2d

28  at 1413) (finding a motion *in limine* preserves an evidentiary

1  issue . . . if "the district court's ruling permitting

2  introduction of evidence was explicit and definitive").

3  Therefore, Defendants have not shown that the challenged ruling

4  justifies granting them a new trial.

5      **F.   Evidentiary Rulings**

6          Defendants also contend they are entitled to a new

7  trial because "[t]here were a significant number of [evidentiary]

8  ruling[s] that, individually and collectively, created prejudice

9  to Defendants." (New Trial Mot. 11:28.) Reese counters: "even

10  assuming, arguendo, that any of [the challenged evidentiary

11  rulings] were incorrect, it is clear that the rulings were

12  neither individually nor collectively prejudicial such that the

13  trial result was 'inconsistent with substantial justice' or a

14  'miscarriage of justice.'" (New Trial Opp'n 18:15-18.)

15          Rule 61 of the Federal Rules of Civil Procedure

16  prescribes:

17          Unless justice requires otherwise, no error
           in admitting or excluding evidence—or any
18          other error by the court or a party—is ground
           for granting a new trial, for setting aside a
19          verdict, or for vacating, modifying, or
           otherwise disturbing a judgment or order. At
20          every stage of the proceeding, the court must
           disregard all errors and defect that do not
21          affect any party's substantial rights.

22  Fed. R. Civ. P. 61.

23      **1.   Questions on Phone Call to Reese Before Opening**

24          **the Door**

25          Defendants contend that it was error to permit Reese's

26  attorney to ask Deputy Brown to speculate about the benefit of

27  placing a phone call to Reese before appearing at Reese's

28  apartment. Specifically, Defendants object to the following

1  testimony:

2       Q. Okay. Based on your training and
        experience, if you placed a phone call, would
3       you tell the person who you were, meaning the
        police?
4
        MR. WHITEFLEET: Objection. Incomplete
5       hypothetical. Calls for speculation.

6       THE COURT: Overruled.

7       [OFFICER BROWN] I see no harm doing that.

8       BY MR. GALIPO:

9       Q. And what would be the benefit, in your
        mind, of doing that, letting them know that
10      you were the police.

11      MR. WHITEFLEET: Objection. The officer has
        not been identified as an expert witness and
12      now we're talking about a hypothetical
        benefit to a potential thing that didn't
13      occur?

14      THE COURT: Overruled.

15      THE WITNESS: I'm sorry. Reask the question.

16      BY MR. GALIPO:

17      Q. What, based on your training, would have
        been the benefit to letting the person in the
18      apartment know if you called that you were
        the police?
19
        MR. WHITEFLEET: Same objections.
20
        THE COURT: I've already ruled.
21
        MR. WHITEFLEET: I'm sorry?
22
        THE COURT: I've ruled.
23
        THE WITNESS: To gain voluntary compliance to
24      answer my questions and come out.

25  (Trial Tr. vol. 1, 102:10-103:1.)

26      Defendants contend:

27      This ruling was an error. It was complete
        speculation whether there would be a benefit
28      and/or such clearly calls for an expert

31

1

opinion. The substantial prejudice is
that . . . now the jury is left with the
2
impression that Deputy Rose (or other
officers) could have avoided the use of force
3
by calling Plaintiff, when the testimony was
[that] they tried to have dispatch locate a
4
number without success. To have the witness
speak to "what could happen" has no relevance
5
because there was no number to call, no
knowing if Plaintiff would answer, and no
6
knowing whether he would have voluntarily
answered questions.

7

8   (New Trial Mot. 12:14-20.)

9          Similarly, Defendants contend that the following

10  question posed to Reese's purported police expert, Clark, should

11  not have been permitted:

12         Q. Let's assume that they did and were able
to call in and tell them they were the police
13         and they wanted to talk to him. You would say
that would be appropriate?
14
           MR. WHITEFLEET: Objection. Assumes facts
15         not in evidence. Incomplete hypothetical.
Irrelevant.
16
           THE COURT: Overruled.
17

18  (Trial Tr. vol. 3, 458:19-24.) Defendants contend: "This

19  question, together with questions to Deputy Brown, are irrelevant

20  to whether force used after [P]laintiff opened the door was

21  reasonable[; t]his left improper impression that some pre-

22  shooting decisions were at issue." (New Trial Mot. 12:25-27.)

23         Reese counters:

24         The objections [to Deputy Brown's testimony]
were properly overruled and Deputy Brown gave
25         an admissible lay opinion that was explicitly
based on his own training and experience. In
26         any event, there could be no prejudice
because the jury learned that Deputy Brown
27         did, in fact, try to obtain a phone number to
make a phone call to [P]laintiff's apartment,
28         but no number was available. Thus, contrary

32

1
2
3
4

> to Defendants' argument, the jury was not
> 'left with the impression that Deputy Rose
> (or other officers) could have avoided the
> use of force by calling Plaintiff" because
> the jury heard the deputies tried to have
> dispatch locate a number without success.

5 (New Trial Opp'n 19:11-19 (citations omitted).)

6    Defendants have not shown that this evidentiary ruling

7 affected Defendants' "substantial rights" justifying a new trial.

8 Fed. R. Civ. P. 61.

9        **2.  Questions to Clark: Whether Police Should Have**

10           **Announced Their Presence, and Whether It Was**

11           **Appropriate for Rose to Shoot?**

12    Defendants further object to the Court's allowance of

13 questions to Clark about the feasibility of announcing police

14 presence. Specifically, Defendants object to the following

15 testimony:

16
17
18
19

> A. That he would clear out of the range of
> the door with the expectation because that
> was the purpose of the knock, that there
> would be an answer, and, therefore, he would
> remove himself out of the -- what we call the
> danger zone, because there is no safety in
> that immediate area of the door.

20
21

> MR. WHITEFLEET: Objection. Move to strike as
> speculative. Nonresponsive.

22

> THE COURT: Overruled.

23 (Trial Tr. vol. 3, 460:13-20.) Reese counters:

24
25
26
27
28

> Evidence about the feasibility of warnings is
> relevant to the totality of circumstances.
> See Graham v. Connor, 490 U.S. at 397; Deorle
> v. Rutherford, 272 F.3d 1272, 1274 (9th Cir.
> 2001) ("[T]he giving of a warning or the
> failure to do so is another factor to be
> considered in applying the Graham balancing
> test.") In fact, Defendants likewise elicited
> testimony and argued about the feasibility of

1    warnings/announcement.

2  (New Trial Opp'n 19:22-27.)

3          Defendants have not shown that the challenged

4  evidentiary ruling justifies granting a new trial.

5          Defendants also object to Reese's hypothetical

6  questions to Clark regarding Rose's decision to shoot.

7  Specifically, they object to the following line of questioning:

8          Q.  And so taking from Deputy Rose's
           perspective, he sees a knife, he backs up,
9          then he moves forward and sees an unarmed
           person standing in the doorway, is that a
10         shoot or don't shoot scenario?

11              MR. WHITEFLEET: Incomplete hypothetical.
           Vague.  Overly broad.  Seeks to invade the
12         jury.

13              THE COURT: Overruled.

14              [CLARK]: It's a don't shoot scenario.

15  (Trial Tr. vol. 3, 541:16-23.) Defendants contend: "This was

16  tantamount to telling the jury it was unreasonable to shoot. This

17  improperly invaded the jury's purview." (New Trial Mot. 13:10-

18  11.)

19          Reese counters:

20          The reasonableness of the decision to shoot
           was a proper subject for expert testimony.
21         See Fed. R. Evid. 704(a) ("An opinion is not
           objectionable just because it embraces the
22         ultimate issue.")  Defendants in fact asked
           the same or similar questions of their
23         expert, Massad Ayoob.  Moreover, the
           hypotheticals asked of Roger Clark were not
24         "incomplete"; they were based on facts in
           evidence because there was evidence that
25         Plaintiff's hands were visible empty when
           Deputy Rose shot him.

26

27  (New Trial Opp'n 20:2-9.)

28          Defendants have not shown that the challenged

34

1 evidentiary ruling justifies granting a new trial.

2           **3.   Testimony of Tracy**

3           Defendants contend that Detective Robert Tracy, a

4 Sacramento County Sherriff's Department Homicide Detective,

5 should have "been able to testify about the observations" he made

6 of the shooting scene. (New Trial Mot. 13:23-24.) Specifically,

7 Defendants point to the following testimony:

8           BY MR. WHITEFLEET:

9           Q. Did you make any observations in terms of
          this particular picture, Exhibit 31, in
10          connection with any other defects that you
          noted at the apartment?
11
12               MR. GALIPO: Objection. Vague as phrased.
          May call for expert testimony.

13               THE COURT: Sustained.

14          BY MR. WHITEFLEET:

15          Q. In your mind did you associate this defect
          with any other defect inside this apartment?
16
17               MR. GALIPO: Objection. May call for
          expert testimony and vague as phrased.

18               THE COURT: Sustained.

19 (Trial Tr. vol. 4, 631:7-19.)

20          Q. And did you make any observations in terms
          of directionality in connection with the
21          other defect as it's shown on Exhibit 31?

22          MR. GALIPO: Objection. Lacks foundation. May
          call for expert testimony. Also vague as
23          phrased.

24          THE COURT: Sustained.

25          MR. WHITEFLEET: May we have a sidebar, Your
          Honor, in terms of the objections that are
26          being raised for the expert versus
          observations?
27
               THE COURT: No.
28
                                 35

1  (<u>Id.</u> at 632:7-16.)

2          Defendants argue, concerning the above evidentiary
3  rulings: "A witness who makes observations on the scene is a
4  percipient witness[; h]e should have been able to testify about
5  the observations." (New Trial Mot. 13:23-24.) Reese counters:

6          Defendants make a false claim that Detective
           Tracy was precluded from testifying about his
7          observations regarding Exhibit 31, a close-up
           photograph of a portion of Reese's carpet
8          where a bullet struck after exiting Reese and
           before ricocheting and coming to rest in the
9          closet door. Contrary to [D]efendants'
           assertion, detective Tracy was permitted to
10         testify fully about his observations within
           the apartment, including (1) that the carpet
11         had been torn by a bullet, which appeared
           consistent with and similar to other
12         roicocheted bullet strikes he had observed on
           other occasions, (2) the distance between the
13         two tears in the carpet inferentially
           associated with the ricocheting bullet and
14         (3) that there were carpet fibers on the 9 mm
           pistol round (fired by Deputy Rose) that was
15         lodged in the door. Detective Tracy was not
           designated as an expert; he testified as a
16         lay witness. Thus, the Court properly allowed
           him to testify about all of his observations
17         and properly precluded him from giving
           expert-type testimony about bullet
18         trajectories.

19  (New Trial Opp'n 20:11-24 (citations omitted).)

20         Defendants have not shown that the challenged
21  evidentiary rulings justify granting a new trial.

22         **4.   Objections to Testimony of Ayoob**

23         Defendants next object to Reese's questioning of Massad
24  Ayoob, Defendants' "expert witness in police practices;"
25  specifically Defendants object to the following portion of the
26  evidentiary record:

27         Q. And one of the benefits [of police
           announcing their presence is] that if [the
28         suspect] had a weapon in their hand, they

1       could drop it before opening the door if they knew it was the police?

2            MR. WHITEFLEET: Objection. Calls for speculation.

3

4            THE COURT: Overruled.

5            [Ayoob]: Repeat the question, Mr. Galipo.

6       BY MR. GALIPO:

7

8       Q. Yes. One of the benefits to the citizen would be if they had a weapon in their hand, not knowing who it was, and they heard it was the police, that would give them an opportunity to drop the weapon before they opened the door to the police?

9

10

11      A. It would.

12 (Trial Tr. vol. 4, 710:2-14.)

13      Defendants fail to explain why they opine the Court's

14 ruling was erroneous and how it prejudiced them. Accordingly,

15 this argument fails to justify a new trial.

16      Defendants also object to the following portion of the

17 trial record concerning Ayoob's testimony:

18       Q. Would you agree, sir, under the facts of this case, Deputy Rose could see Mr. Reese's hands and he had nothing in his hands; can you assume that for a moment?

19

20

21       MR. WHITEFLEET: Objection. Compound. Vague as to time.

22       BY MR. GALIPO:

23       Q. Just before he shot. Do you have that in mind?

24

25       A. That he could see or did see?

25       Q. Did see.

26       A. We're assuming he does see empty hands?

27       Q. Correct. Would you at least agree then it would be inappropriate to shoot?

28

37

1   MR. WHITEFLEET: I'll object. There's no
2   testimony that Deputy Rose saw empty hands.
    It's an incomplete hypothetical.

3   THE COURT: The jury decides whether
    there's evidence in the record to support any
4   question asked by either side. The objection
    is overruled.

5

6   [Ayoob]: If the individual is no longer
    assaulting the officer had seen that the
    hands are empty, the officer would have no
7   grounds to shoot.

8   (Id. at 718:9-719:5.)

9   Q. Let's say, under my hypothetical, he opens
    the door and sees the police and drops the
10  knife immediately. Let's say within half a
    second of opening the door, he drops the
11  knife. Are you with me?

12  A. I am.

13  Q. Is it okay to shoot him?

14  MR. WHITEFLEET: Incomplete hypothetical.
    Vague.

15
    THE COURT: Overruled.
16
    THE WITNESS: If the officers have seen
17  him drop the knife and he's standing in the
    position you describe which is essentially
18  the surrender position with his hands
    shoulder high, no, it certainly would not be
19  appropriate to shoot. That would be
    indication of surrender.

20

21  (Id. at 724:16-725:3.)

22      Defendants contend this questioning was premised on

23  improper hypothetical questions and the rulings therein

24  constitute reversible error because "[h]ypothetical [questions]

25  must be based on facts in evidence[; n]o evidence shows that Rose

26  could see Reese's hands[; i]n fact [the] jury found he did not

27  see his hands." (New Trial Mot. 14:8-9.) Defendants further

28  contend "there was no evidence Plaintiff opens the door and drops

38

1  the knife immediately." (Id. at 14:13-14.)

2         The jury ultimately determined that "[a]t the time

3  Deputy Rose fired his shot, he did [not] see Plaintiff's hands."

4  (Verdict Form Question No. 13.) Defendants have not shown they

5  were prejudiced by the challenged rulings; therefore, this

6  argument does not justify granting a new trial.

7         **5.   Admission of Photographs of Reese**

8         Counsel for Reese offered Exhibits 42, 43, 44, 45, and

9  46, which are photographs of Reese taken at the hospital after he

10 sustained his gunshot wound. Defense counsel objected to these

11 exhibits as cumulative and unduly prejudicial. The Court

12 overruled Defendants' objection and admitted all of the photos.

13 (Trial Tr. vol. 2, 256:2-5.) Counsel for Reese also offered

14 Exhibit 30, which is a pile of Reese's clothes post-shooting.

15 (Id. at 265:4-10.) Defendants objected to this evidence as

16 irrelevant but the Court admitted the exhibit.

17         Reese counters:

18         Plaintiff's damages in this case are based on
           the fact that he was shot by Defendant Rose.
19         At trial, Plaintiff used photographs showing
           his injuries to establish his damages. . . .
20         The photographs were relevant because they
           bore on the question of damages.
21

22 (New Trial Opp'n 20:27-30.)

23         Defendants have not shown that the admission of the

24 challenged evidence was so unduly prejudicial that it justifies a

25 new trial. See, e.g., Robert v. Conti Carriers & Terminals, Inc.,

26 692 F.2d 22, 25 (5th Cir. 1982) (affirming district court's

27 admission of photographs showing the medical condition of

28 plaintiff's hands, which were probative and not unfairly

39

1  prejudicial with respect to damages on plaintiff's negligence

2  claim).

3          **6.   Availability of Brittany Shurtleff**

4          Defendants argue they should be granted a new trial

5  because they were not allowed to read portions of Brittany

6  Shurtleff's deposition testimony into evidence under Federal Rule

7  of Evidence 804(a)(5), which concerns the unavailability of

8  witnesses, despite having served a subpoena on Shurtleff and

9  despite her failure to appear.

10         To be "unavailable" under Federal Rule of Evidence

11  804(a)(5), the party seeking to use the witness's prior testimony

12  must show efforts to secure the witness's attendance "by process

13  or other reasonable means." Simply serving a subpoena is not

14  enough. <u>See</u> <u>Forbes v. Cty. of Orange</u>, 633 F. App'x 417, 418 (9th

15  Cir. 2016) (holding the trial court did not abuse its discretion

16  in refusing to admit witness's deposition testimony even though

17  party seeking to introduce testimony had served a subpoena, as

18  party did not make subsequent "reasonably diligent efforts" to

19  secure witness's attendance).

20         When attempting to introduce the witness's deposition

21  testimony at trial, the following exchange between defense

22  counsel and the Court ensued:

23              MR. WHITEFLEET: I have proof of service of
                subpoena on Ms. Shurtleff, if the court would
24              like to see it in order to determine
                unavailability. I can at least verbally
25              indicate to you that when the processor
                server told us he handed the subpoena to Ms.
26              Shurtleff, she indicated with some expletives
                that she did not intend to comply.
27
                THE COURT: When did that occur?
28
                                    40

1  |  MR. WHITEFLEET: At the time of service.

2  |  THE COURT: That's helpful; however, what
3  |  hour and day did that occur?

4  |  MR. WHITEFLEET: October 22, 2015. If the
   |  court would like to see the proof of service,
5  |  I can provide that.

6  |  THE COURT: I'm thinking that's a couple
   |  weeks ago; is that about right? Isn't this
7  |  November 3rd?

8  |  MR. WHITEFLEET: Yes, Your Honor. The start of
   |  the trial was supposed to be October 26. That
9  |  was four days before the original date set.

10  |  (Trial Tr. vol. 4, 732:2–18.)

11  |  Defense counsel admitted he was aware that the witness

12  |  had no intention of appearing in court, but failed to make

13  |  additional reasonable efforts within the weeks before trial to

14  |  ensure Shurtleff's appearance in court. Therefore, Defendants did

15  |  not make the required "reasonably diligent efforts" to secure

16  |  Shurtleff's attendance to justify finding her unavailable under

17  |  Federal Rule of Evidence 804(a)(5). Thus, Defendants have not

18  |  shown this ruling constitutes an error justifying a new trial.

19  |  **IV.   CONCLUSION**

20  |  For the above stated reasons the renewed Motion for

21  |  Judgment is GRANTED on Defendant Rose's qualified immunity

22  |  defense, and DENIED on the remaining issues. Reese's past medical

23  |  expenses and the damages award is reduced by $21,175.00;

24  |  therefore, Reese's total award for past medical expenses is

25  |  $13,165.00. Further, judgment is amended to reflect that

26  |  Defendants prevail on Reese's Bane Act claim. The remaining

27  |  portions of Defendants' Motion for New Trial are DENIED.

28  |  The Clerk of Court shall amend judgment as follows:

1    Judgment is entered in favor of Defendant Rose on
2  Plaintiff's Fourth Amendment claim since Rose prevails on his
3  qualified immunity defense. Judgment is entered in favor of
4  Defendants on Plaintiff's Bane Act claim. Judgment is entered
5  against Defendant Rose and Defendant County of Sacramento on
6  Plaintiff's battery claim. Plaintiff is awarded $350,000.00 for
7  past non-economic loss, $150,000.00 for future non-economic loss,
8  and $13,165.00 for past medical expenses for a total of
9  $513,165.00 in compensatory damages.
10  Dated:  June 2, 2016
11
12
13                              _____
                                GARLAND E. BURRELL, JR.
14                              Senior United States District Judge
15
16
17
18
19
20
21
22
23
24
25
26
27
28

42